McGINNIS *vs.* THE JUSTICES OF THE INFERIOR COURT OF GORDON COUNTY.

1. An injunction will not be dissolved on the coming in of the answer, unless the answer fully swears off or denies all the equities of the bill, especially when the injunction is necessary to protect the complainant from an invasion or trespass upon his property.

2. Where a general demurrer has been heard and adjudicated, the Court will not, on a motion subsequently made to dissolve the injunction on the coming in of the answer, consider any objection to the bill that was properly involved in the demurrer.

In Equity, in Gordon Superior Court. Decision by Judge CROOK, at Chambers, January, 1860.

This was a bill filed by Stephen McGinnis, against the Justices of the Inferior Court of Gordon county, to enjoin them from pulling down and removing the toll gates erected by complainant across the public highway, at his bridge, over the Oostanaula river, and to enjoin and restrain the collection of an execution issued against complainant by the Commissioners of Roads, under the order and authority of said Justices, to enforce the payment of a fine imposed upon complainant for the erection of said toll-gate; said fine being imposed upon the pretence that said gates are unlawful obstruction of a public highway. The bill alleges that the premises upon which said bridge and toll-gates are erected, is the property of complainant, and that he purchased the same with said bridge and toll gates, as appurtenant and belonging thereto, and established and recognized by the Superior Court of said county, as a toll bridge, with the right and authority of complainant to exact and receive toll, according to a rate established by said Court.

To this bill defendants demurred, and, upon argument, the Court overruled the demurrer, and ordered defendants to answer.

Upon the coming in of the answer, defendants moved to dissolve the injunction. After argument, the Court granted the motion, and dismissed the bill, upon the ground that there was no such case of irreparable injury, by the trespasses complained of and threatened, as entitled complainant to the interposition of a Court of Equity, and that said injunction had been improvidently granted.

To which decision counsel for complainant excepted and assigns the same as error.

SHEPPARD, JOHNSON & PHILLIP, for the plaintiff in error.

DABNEY & FAIN, *contra.*

*By the Court.*—LYON, J., delivering the opinion.

The complainant filed this bill returnable to the October Term, 1858, of Gordon Superior Court. At that term the defendants to the same appeared and put in a general demurrer for the want of equity, and after argument had, the Court overruled the same at that term. From this judgment no appeal or exception was taken by defendants, but they then put in their answer, and at the April Term, 1859, moved to dissolve the injunction on the ground that the equity of the bill was fully denied by the answer. Upon this motion, the Court "dissolved the injunction and dismissed the bill, on the ground that there was no sufficient allegation of irreparable mischief, to restrain the trespass, and that the injunction was improvidently granted."

This judgment we are called on to review, and it is insisted by counsel for defendants, that, although the Court below may have improperly dismissed the bill, and dissolved the injunction on the wrong ground, or for a wrong reason ; yet, as the true question before the Court, was a motion to dissolve the injunction on account of the denial of the equity of the bill by the answer, so, that is, or ought to be, the true question before this Court; and if we should be

McGinnis *vs.* The Justices, etc., of Gordon County.

satisfied that the answer fully denies all the equities of the bill, then this Court ought, at least, to affirm that part of the judgment which dissolves the injunction. Agreeing as we do with the counsel for defendant in this respect, we shall consider the judgment under review in that aspect. Then, does the answer fully deny all the equities of the bill?

The equities of the bill are, that the Inferior Court of Gordon county, being the owners of that part of lot No. 191, in the 14th district and 3d section of said county, on which was situated the bridge across Oostananla river, built by Washington Lawson, having purchased the same at sheriff's sale as the property of said Lawson under executions against him, did on thirty-first day of October, 1855, sell the same to one Newton McDill for the sum of $1,500, which has been fully paid to the Inferior Court of Gordon county, the whole of which has been received and appropriated to the use and benefit of the county of Gordon; that to induce McDill to make that purchase, the then said Inferior Court represented to him that the tolls from the bridge would yield him the net sum of $100 per month; that the said Court would establish the road-crossing on and at that bridge as a public highway, and they as a Court would by its order vest in him the right to charge toll on all persons crossing, at a tariff of tolls to be fixed by the Court; that McDill did purchase on these representations and inducements; that the Inferior Court in compliance with their agreement, and in execution of this contract, did on the same day of the sale pass an order of that Court changing the road leading to Lawson's ferry, so as to cross on that bridge, and authorizing McDill to establish the rates of toll on said bridge, said order being subsequently amended so as to read "and the same is made a public highway from the time of Newton McDill's" purchase from the Inferior Court; and in this amended order the rates of toll were fixed and prescribed by that Court for all crossing on the bridge with this single qualification, that persons hauling grain or desirous of trading in Calhoun would be charged but half price. That three of the members of the Court on the day of sale gave to McDill their bond to execute titles to him or his assigns on the payment of the purchase-money, for the faithful performance of which they not only bound themselves individually, but also their "successors in office as Justices of the Inferior Court

of Gordon county," and in that bond to make titles to the land sold was not only particularly specified, but also "together with the bridge which stands thereon;" that subsequently, on the 26th day of January, 1857, the Inferior Court transferred their bid at sheriff's sale of the premises to McDill, and directed the sheriff of Gordon county to make titles to him, and that the sheriff did so. That complainant subsequently purchased the premises, including the bridge, and that he now in all respects occupies the place in the contract that McDill held, and is possessed by virtue thereof with all the rights and equities that McDill had. That now, notwithstanding the clear rights of complainant under the aforesaid statement of facts, the present Inferior Court, in the face of the solemn contract and obligations of their predecessors, and of their express grants, all of which appear on the minutes of the Court, and are exhibited to the bill, they are using their offices as Justices of the Inferior Court to disturb complainant in the full and free use of his premises, and the exercise and enjoyment of his rights under said contract, and grants from the Inferior Court, by causing his toll-gates to be torn down as obstructions in the highway, and to coerce him by fines, threats, lawsuits and penalties under color of their office, and without authority of law, and against right, to permit the citizens of Gordon county to pass over his said bridge free of toll.

The defendants, in reply, after admitting that they know nothing of the representations made to McDill, or of the inducement held out by their predecessors to McDill to buy the premises, deny that their predecessors sold the premises to him as the Inferior Court of Gordon county for $1,500 00, or any other sum, or that they as a Court bid off the premises; but if they did buy or sell the premises to McDill, they did so as individuals, and not as a Court as they, defendants, are unable to find on the minutes of the Court any order authorizing such purchase or sale, and this is the whole extent of their denial. Do they deny that their predecessors in the purchase of the lands at sheriff sale, and in its subsequent sale to McDill acted in their representative character for the benefit of the Court of which they were members, and of the county which they represented, or that they in doing so made the representation, and held out the inducements to McDill as charged in the bill? Do they deny that the Court and the

county got the full benefit of the entire operation; that they got the purchase money? These facts are not denied by the answer, yet, they constitute the very gravamen of the bill. Besides an examination of the bond given by three of the members of the Court, to-wit: Fain, Swaggerty and King, on the 31st of October, 1855, as well as the order of that Court on the same day, the subsequently amended order, and transfer of the bid of the Inferior Court to McDill, must satisfy any impartial inquirer in the absence of other proof that the allegations of the bill are true. The land on one side of the river was bid off by Stephen T. Mays, a member of the Court, who does not join in the bond; that on the other side was bid off by Swaggerty. Now, if they bought as individuals, and not as a Court, why did not Mays join in the bond, and why did Fain and King, who were not purchasers give their bond? Again, if it was an individual transaction, why did these persons in addition to personal obligation, also stipulate for their successors in office as Justices of the Inferior Court? Then, again, why did these orders of the Court follow so simultaneously with the contract and sale, if not in execution of the contract as charged, and as a part of the same? To all these inquiries, and they are fairly presented by the bill and exhibits, the answer makes no response, nor offers any explanation whatever.

It appears from the answer, that when Lawson projected the building of this bridge, the Inferior Court for the purpose of securing a free passage for the citizens of Gordon county across the bridge, at first subscribed and paid to Lawson $500 00, in consideration of which sum, Lawson agreed that the citizens of Gordon might pass over the bridge; that subsequently as the bridge advanced, Lawson, from his embarrassments, was about to fail with the bridge, and the Court to prevent such failure, borrowed from G. P. King $3,000 00 on the note of the county, and paid it over to him to aid in the building of bridge, which sum was to be refunded to the Court when collected from subscriptions, and that the Court again contributed $500 00 more to aid him in repairing a damage done to the bridge by freshet, making in all about $4,000 00 that the county of Gordon, through its Inferior Court, had invested in this bridge, while in the hands of Lawson, to enable him to complete it so as to secure to the citizens the free use of the bridge. Right here the defendants plant them-

selves on the proposition, that under this contract with Lawson, and in consequence of these different investments and contributions to secure this object, the citizens of Gordon county acquired a vested right to pass over the bridge free of toll for all time to come into the hands of whomsoever it might come, that could not be divested by the sheriff's sale of the same under an execution against Lawson of a lien of junior date to this contract, and this is a sound proposition, but it does not meet the facts of this case. The complainant's right to relief does not depend on a denial or abridgment of the principle involved in that proposition. The citizens of the county acquired this right under a contract of the Inferior Court, as their representative, with Lawson. So long as the bridge remained in the hands of Lawson, and all others holding under him with notice, this vested right attached to it, but when the land, and of course the bridge resting on it, was sold, and the Inferior Court became the purchaser, the two interests—that is, the bridge itself, and the right of the citizens to pass over it free of toll—united and became one undivided interest belonging entirely to the county ; the one interest as much as the other, and the Inferior Court had the same right to part with one as the other, and the whole as much as a part. And the bill in effect charges this to be the case. It was through the contract of the Inferior Court that the citizens acquired the right, and it was by the contract of the Inferior Court with McDill, that this right was parted with by the citizens and not by the sheriff's sale.

The sheriff's deed to Newton McDill recites the fact, that this property was bid off on the first Tuesday in September, 1855, at the sum of $2,355 00; that is, that the creditors of Lawson realized from that sale only that amount for all that property. I take it from this, that the Inferior Court bid off the property at that price. Now, if this is the fact, there is one view of the case that surely neither the present Inferior Court, or the citizens of Gordon County, have taken of this transaction, or that sense of justice and right, which ought to animate and control the action of all tribunals as well as of individuals, would have impelled a more charitable feeling and conduct towards the complainant and his right in this property.

That sum, $2,335 00, was the bid of the Inferior Court ;

McGinnis *vs.* The Justices, etc., of Gordon County.

that is what they paid for the property, but McDill paid them $6,500 00, being $4,165 00 more than it cost at sheriff's sale, and this large sum of money has been actually received by the county from McDill. What could have induced him to pay the Inferior Court so much more for the premises than they paid for it? The bill says that it was paid on the faith of the promises and agreement of the Inferior Court, that the bridge should be a general toll bridge, etc., and this is not denied by the answer. Now, the Inferior Court had contributed $4,000 00, as has already been shown towards the building of the bridge for the purpose of securing to the citizens a free transit over the same, when $500 00 was considered by them and Lawson in the first place as sufficient for that purpose. When Lawson became insolvent, and the property was seized for his debts it must have become apparent to the Court that the $3,000 00 borrowed of Mr. King would certainly be lost to the county, and possibly the right of the citizens to the use thereof free of toll if the land and bridge on it should be bid off by, and pass into the hands of, a stranger. Is it not fair to suppose from all the facts of the case, that the members of the Court to prevent so great a loss to the county, as such a result would have been, stepped in at that sale and became the purchasers of the whole property for the use of the county? When they had done so the county had invested $6,335 00 in the property. Now, is it not more than likely that the Justices of the Inferior Court at this point came to the conclusion that they were paying too much for the intended benefit, the mere right of the citizen to cross on the bridge free of toll? It had cost them more, much more than they contemplated; more probably than their constituency would approve, and governed by the desire to promote the best interest of the county determined to sell the whole property with no other reservation than such is made in the order appended as an exhibit to the bill, and from the sale refund to the county all that had been contributed for that purpose. Whether these motives actuated the Court in that sale or not, it is clear that they, in fact, did then part with the land and bridge to McDill, and whether from design or inadvertence they failed to reserve the right of the citizens to pass the bridge free of toll; that is, if the facts stated in the bill, and not denied by the answer are true; and it is equally clear that the county from

the sale so made by the Inferior Court to McDill, was reimbursed all that was paid or advanced by the Court to Lawson to enable him to build the bridge, and secure this benefit, for the $6,500 00, paid by McDill to the Inferior Court covers all the outlay which is set up by the answer. Then if it be true that the county has received back all that she paid out for this vested right of which so much is said, and it has been fairly sold and paid for by McDill, and secured by a solemn grant from the Inferior Court, which vests in complainant by his purchase, it would be grossly unjust and inequitable to deprive him of the same or to interfere in any way with his full, free and perfect enjoyment thereof.

Defendants admit that they have instructed road commissioners to remove the toll gates and keep open the same for the free passage of the citizens of the county; the infliction of the fine; the passage of the order, etc., and plead as a justification or excuse, the recommendation of the grand jury of the county. The unauthorized action of any body of men, however respectable, can never excuse an independent judicial tribunal for an invasion of the rights of an individual unheard.

It is said by the defendants in their answer, by way of an avoidance of the equities of the bill, that the sheriff's sale was illegal; that no title passed; that the land was not legally sold; that the bridge was not sold; that the bid of the Inferior Court was not legally transferred, etc. Then it is of the greater importance that the bill should be retained to settle and quiet the title to the premises, and if it be true that no title did pass to McDill, the county of Gordon surely, under the circumstances, would refund the purchase money. If the facts in this bill are true, it does not lie in the mouths of these defendants to cast a cloud on the complainant's title.

For these reasons, and as the answer does not fully and completely deny the equity of the bill; the judgment of the Court dissolving the injunction and dismissing the bill was erroneous, and must be reversed. The injunction, as well as the bill, must be retained to a hearing on their merits.

It was argued with great force by counsel for defendants, that the judgment of the Court below ought to be affirmed, because they argue there was no equity in the bill; that complainant's remedy at common law in trespass was adequate and complete; that this bill could not be maintained

against defendants as an Inferior Court. To all this the reply of the Court is, that these questions were involved in the demurrer, and were by the judgment of the Court below thereon fully adjudicated, and they are now between these parties no longer open questions. My own opinion is, that there is equity in the bill, and that injunction is the proper remedy; but as the judgment of the Court is not put on that ground it is not necessary to give the reason.

Judgment reversed.